UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                           :

SIMPLEXGRINNELL LP,               :
                           :

                Plaintiff,    :       07 Civ. 2700 (GEL)
       -v-                  :
                           :      **OPINION AND ORDER**

INTEGRATED SYSTEMS & POWER, INC., f/k/a :
SIMPLEX OF NEW YORK CITY, LLC, f/k/a/  :     **FINDINGS OF FACT AND**
NEW YORK CITY, LLC,             :     **CONCLUSIONS OF LAW**
                           :

                Defendant.   :
                           :
------------------------------------------------------------- x

Richard M. Simes and Paul M. Lavelle, Abbott,
Simses & Kuchler, APCL, Houston, Texas and
James K. Leader, Leader & Berkon LLP,  New York,
New York, for Plaintiff.

Kevin J. Nash, Finkel Goldstein Rosenbloom &
Nas, LLP, New York, NY and Theodore C. Max,
Sheppard, Mullin, Richter & Hampton, New York,
New York, for Defendant.

GERARD E. LYNCH, District Judge:

      Plaintiff SimplexGrinnell LP brings this action against defendant Integrated Systems &

Power, Inc. ("ISPI"), asserting a variety of claims centering around the rights and obligations of

the parties in conjunction with an earlier settlement agreement between them in an unrelated

bankruptcy proceeding.  Specifically, SimplexGrinnell brings claims for copyright infringement,

misappropriation of trade secrets, unfair competition through false advertising, and breach of

contract.  ISPI in turn asserts a breach of contract counterclaim.  The case was tried before the

Court without a jury on November 10 and 12, 2009.  This Opinion sets forth the Court's Findings

of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

To the extent any Finding of Fact reflects a legal conclusion, it shall be to that extent deemed a

Conclusion of Law, and vice versa.  For the reasons stated below, the Court concludes that a limited injunction against ISPI is warranted to prevent further copyright infringement, misappropriation of trade secrets and unfair competition through false advertising practices, but not to the full extent requested by SimplexGrinnell.

## FINDINGS OF FACT

**I.     Background to the Dispute**

 A. <u>The Parties</u>

 1.  Plaintiff SimplexGrinnell manufactures, sells and services commercial fire safety systems nationwide.

 2.  Defendant Integrated Systems & Power, Inc. ("ISPI") is also in the fire safety system business and operates in New York and New Jersey.  It does not manufacture its own brand of fire systems but rather primarily provides a variety of service functions, such as general inspections, servicing, maintenance and repair.  (Guarino Aff. ¶ 50.[1])

 3.  Thus, SimplexGrinnell and ISPI compete for service customers in the New York and New Jersey markets.  (<u>Id</u>. ¶ 7.)  Oftentimes, the division of labor works such that a customer will contract with SimplexGrinnell to install a fire alarm system at a particular site, and will thereafter

---

[1]  On the eve of trial, SimplexGrinnell moved to strike the affidavit of Andrew Guarino, the president, director, and fifty percent stockholder of ISPI (Guarino Aff. ¶ 1), contending that the affidavit is so infected with inadmissible testimony that it should be stricken in its entirety as it is not feasible to properly segregate the admissible from inadmissible portions.  (Trial Tr. 4; Doc. #65.)  The Court is mindful that a lay witness's testimony must be based on the affiant's personal knowledge.  However, the Court, has no difficulty distinguishing the admissible testimony contained in this affidavit from the inadmissible, and relies only on the former in reaching its findings and conclusions.  Accordingly, the motion is denied.  Also on the eve of trial, SimplexGrinnell moved for leave to file additional trial affidavits.  (Doc. #66.)  This motion is granted to the extent the affidavits in question were considered in ultimately reaching the following findings and conclusions.

retain ISPI to service and maintain the system.

4.  Prior to 2002, SimplexGrinnell and ISPI were allies with a close business relationship. Indeed, ISPI originated in 1987 as a local service company for SimplexGrinnell's predecessor, the Simplex Time Recorder Company.  (Id. ¶¶ 3-4.)  From that time until 2001, ISPI, through its wholly owned subsidiary – a company called Simplex of New York LLC – operated effectively as a branch office of SimplexGrinnell and served as plaintiff's agent and representative in the New York City area.  (P. Proposed Findings at 1; Guarino Aff. ¶¶ 3-4.)  In 2002, SimplexGrinnell Terminated ISPI's agency agreement.  (Guarino Aff. ¶ 3; Ex. B.)

B.    Bankruptcy Proceedings and the 2004 Bankruptcy Stipulation

5.  On September 26, 2002, ISPI (together with Simplex of New York City, LLC) filed for Chapter 11 bankruptcy protection.  (Guarino Aff. ¶ 8; Ex. D ¶ A.)  As part of its bankruptcy case, ISPI instituted an adversary proceeding against SimplexGrinnell, alleging, among other things, breach of contract and various business torts.  (Guarino Aff. ¶ 10; Ex. D ¶ B.)

6.  On May 6, 2003, the bankruptcy court granted ISPI a preliminary injunction requiring SimplexGrinnell to provide ISPI with all parts and equipment necessary for servicing ISPI's then existing customer base, at a contractually agreed upon price of fifteen percent off list price, and to provide ISPI with various forms of technical support.  (Ex. C at ISPI 0014-15.)

7.  In early 2004, with the aid of a court-appointed mediator, the parties resolved their respective claims and entered into a stipulated settlement (the "Bankruptcy Stipulation"), which was ordered by the Bankruptcy Court on March 29, 2004.  (Ex. D.)

8.  That settlement required SimplexGrinnell to pay $1,100,000 to ISPI (Id. ¶ 2), and voided all prior agreements between the parties, "whether express or implied, based upon any written or oral agreements, statements or correspondence, course of conduct or otherwise" (id. ¶

3

5), including the preliminary injunction issued by the Bankruptcy Court (<u>id</u>. ¶ 3).

9.   Although the parties agreed to terminate their prior business relationship, the agreement provided ISPI with certain rights above other competitors with respect to ISPI's customer base existing as of the time of the Stipulation.  Specifically, paragraph nine of the Bankruptcy Stipulation requires SimplexGrinnell to "sell service parts (currently identified by SimplexGrinnell with a six-digit product identification number), including 'patches' and 'fixes' to [ISPI] for the Existing Customer Base at list price and on a 'cash on delivery' basis." (<u>Id</u>. ¶ 9.) "Service parts" are not further defined by the Stipulation (nor are the terms 'patches' or 'fixes'), but the Stipulation requires SimplexGrinnell to provide ISPI with a price list for service parts. (<u>Id</u>. ¶ 11.)

10.   The "Existing Customer Base" referred to in paragraph nine is set forth in a separate document and includes the names and addresses of over 200 sites at which ISPI operated as of February 1, 2004 ("ISPI Customer List").  (Ex. E; <u>see also</u> Ex. D ¶ 8.)

11.   The Bankruptcy Stipulation also requires SimplexGrinnell to provide ISPI with technical support in the form of technicians from SimplexGrinnell's "Avenel, New Jersey office, at ordinary time and material rates, on a 'net 30' basis; <u>provided</u>, <u>however</u>, that 'technical support' shall not include '800 number' or 'online access' or access to any other proprietary information or networks of SimplexGrinnell."  (Ex. D ¶ 10.)

12.   The Bankruptcy Stipulation provides for the applicability of New York law (<u>id</u>. ¶ 20), and further provides that "the prevailing party shall be entitled to recover its reasonable attorneys' fees and costs . . . incurred in connection with any action or proceeding arising out of or related to the enforcement of this Settlement Agreement . . ." (<u>id</u>. ¶ 18.)

II.      **Fire Alarm System Panel Programming Software**

13.   Two of the fire alarm systems manufactured by SimplexGrinnell, called the 4100 and

4100U systems, lie at the heart of this dispute.  In particular, this dispute largely centers on

whether the software used to program and configure those systems – "the Programmers" – are

covered by the requirement of paragraph nine of the Bankruptcy Stipulation of SimplexGrinnell

to sell ISPI "service parts . . . including 'patches' and 'fixes.'"

14.   Understanding of the fundamentals of these systems comes primarily from the

testimony of Andrew Capowski, SimplexGrinnell's current Director of Research and

Development who has been with the company for over ten years (Capowski Aff. at 1), Charles

LoRocco, a service technician for ISPI (LoRocco Aff. ¶ 1), and ISPI's expert witness, computer

science Professor Benjamin Goldberg (Goldberg Rpt. ¶ 1), all of whom the Court found to be

credible witnesses.

15.   The 4100U is the successor to the 4100 system (Capowski Trial Tr. 45); the "U" in

the 4100U stands for "upgrade."  (Capowski Dep. 6.)  Both of these systems are comprised of

"networks of 'points' (smoke detectors, notification devices, etc.) and control panels. . . .

contain[ing] CPUs (central processing units) running Simplex software [("panel software")] for

controlling interaction with the points and other components of the fire alarm system."  (Goldberg

Rpt. ¶ 9.)  In addition to the panel software, each system also has associated programming

software – i.e., the 4100 Programmer and the 4100U Programmer – which is "used to configure

[the] control panel once the fire alarm system has been installed in a building."  (Id. ¶ 10; see also

Capowski Trial Tr. 20.)  The Programmer's basic function is to configure the corresponding

"control panel for a particular installation of the fire alarm system in a building" (Goldberg Rpt.

¶ 11), and to ensure that the control panel knows the system's configuration so that it can properly

operate its hardware (Capowski Aff. § 3.4(2)).

16.   Although the 4100U Programmer has several additional features and capabilities compared with the 4100 Programmer (see id. § 2.2), the Programmers are functionally equivalent in the most basic sense in that the 4100 Programmer is used to configure a 4100 panel just as the 4100U Programmer configures a 4100U panel.  (Capowski Trial Tr. 19.)  However, the Programmers are not interchangeable: 4100 panels must be programed with the 4100 Programmer and 4100U panels likewise must be programmed with the 4100U Programmer.  (See id.)

17.   The Programmer software can run either through a laptop computer or it can be run through an on-site network computer, called a graphic command center ("GCC").  (LoRocco Trial Tr. 77; Capowski Aff. at 2.)  In either manner, to access and run the programmer software, a software key – also known as a "dongle"[2]– must be attached to the computer.  (Capowksi Aff. at 2.)  Without a dongle, the Programmer will not run.  (Capowski Trial Tr. 22.)

18.   Each time the Programmer is used, "the computer loads it into the computer's random access memory (RAM), where it remains until the technician finishes making whatever changes to the system configuration may be necessary.  This process could take minutes or hours, depending on the extent of the changes."  (Capowski Aff. at 2.)

A.    Revisions and Versions of the Programmers

19.   There are multiple software revisions associated with each Programmer.  Specifically, the 4100 Programmer is associated with revisions 8 and 9, and the 4100U Programmer started with revision 10, and is currently up to revision 12.

_____

[2] Dongle is the somewhat newer terminology for a software key and uses newer technology.  Functionally, however, a dongle is similar to a software key and for the purposes of this case, no distinction need be made.  (See Guarino Trial Tr. 121-22.)

20.  Further, within each revision there are a number of versions.  There are currently approximately fifty versions of the 4100U Programmer, spanning revisions 10, 11 and 12.  (Ex. P; see also Capowski Trial Tr. 51.)  For example, versions 10.01, 10.50, 10.60, 10.61, 10.60.99 and 10.61.01 are all part of revision 10.  (Ex. P.)

21.  The particular version of the Programmer must match the panel.  Thus, not only must 4100U panels be programmed with the 4100U Programmer, as mentioned above, but more specifically, a 4100U panel installed with version 12.01 must be programed with version 12.01 of the 4100U Programmer, rather than a revision 11 Programmer, or even version 12.05 of the software.  (Id. at 43-44, 46.)

B.    The 4100 Programmer is a "Service Part"

22.  SimplexGrinnell does not dispute that ISPI has a  right to use the 4100 Programmer to service customers on the ISPI Customer List.  Indeed, SimplexGrinnell concedes that through the Bankruptcy Stipulation it granted ISPI an implied limited license to use "SimplexGrinnell's copyrighted panel programming software up to Rev. 9 for the customers, and at the sites, listed on the 'ISPI customer list.'"  (P. Mem. 11.)  The Bankruptcy Stipulation granted ISPI this license, SimplexGrinnell contends, since the customers on the ISPI Customer List had installed pre-4100U panels that could only be programmed with revisions 9 or earlier.  (Id. at 2.)

23.  The Bankruptcy Stipulation only requires SimplexGrinnell to sell ISPI "service parts" for customers on the ISPI Customer List, which directly implies that ISPI may then *use* the parts.  (See Ex. D ¶ 9.)  Thus, SimplexGrinnell's concession that ISPI may use the 4100 Programmer to service customers on the ISPI Customer List is an implicit admission that the 4100 Programmer is a "service part."

24.  This finding is supported by the fact that the sole descriptive indicator of "service parts" in the agreement is items "currently identified by SimplexGrinnell with a six-digit product identification number . . . ."  (Id. ¶ 9.)  At the time of the Bankruptcy Stipulation in 2004, SimplexGrinnell sent ISPI a price list identifying revisions 8 and 9 of the 4100 Programmer, with, respectively, the six-digit identification numbers 553-806 and 553-854.  (2004 Price List, Ex. F at ISPI 0827-28.)

  C. The 4100U Programmer is a "Service Part"

25.  Not only was the 4100 Programmer designated with a six-digit identification number at the time of the Bankruptcy Stipulation, but so was the 4100U Programmer.  SimplexGrinnell's March 2004 price list identifies the "4100U C/D Programmer" with the number 741-213.  (Id. at ISPI 0877.)  Moreover, the 4100U Programmer continued to be identified on many of SimplexGrinnell's subsequent price lists with the number 741-213.  (2005 Price List, Ex. G at ISPI 0038; 2006 Price List, Ex. H at ISPI 0042; 2008 Price List, Ex. J at 0183.)

26.  Of course, as SimplexGrinnell rightly contends, it is not necessarily the case that service parts are coterminous with products identified with six-digit numbers – it may indeed be the case that not all parts represented by six-digit part numbers are service parts and not all service parts are represented by six-digit numbers.  However, although the Bankruptcy Stipulation does not equate the two, identification with a six-digit product number at the time of the Bankruptcy Stipulation is strong probative evidence that the product falls within the ambit of "service parts" as used in the Stipulation.  Otherwise, the parenthetical description in the Bankruptcy Stipulation that the "service parts" are "currently identified with a six-digit" number – which is the sole indicator provided by the Stipulation as to the meaning of this term – would be rendered largely superfluous.

27.  In any event, there is ample additional evidence that the 4100U Programmer is a service part.

28.  SimplexGrinnell repeatedly communicated to ISPI that the 4100U Programmer was a service part.  The above referenced price lists containing the 4100U Programmer were provided pursuant to the requirement of paragraph eleven of the  Bankruptcy Stipulation that SimplexGrinnell provide price lists for its "service parts" upon IPSI's written request to the General Counsel of SimplexGrinnell.  Indeed, each of the prices lists is attached to an e-mail from SimplexGrinnell's counsel to ISPI.  (See Exs. F, G, H, J.)  The cover e-mail from SimplexGrinnell's corporate counsel to Andrew Guarino of ISPI attaching the 2006 price list (which includes the 4100U Programmer) states in no uncertain terms that it is attaching a list of "service parts":  "Attached please find the quarterly price list for *service parts* pursuant to the settlement agreement."  (Ex. H at ISPI 0039 (emphasis added).)

29.  That the legal department repeatedly provided ISPI with "service parts" lists containing the 4100U Programmer and indeed explicitly termed the Programmer a "service part" is significant: the legal department is presumed to be aware of the import of the phrase "service part," and the attendant obligations of SimplexGrinnell with respect to "service parts"pursuant to the Bankruptcy Stipulation.

30.  SimplexGrinnell also appears to have designated the 4100U Programmer as a "service part" in its internal operations.  On some of the price lists provided to ISPI, the letters "SP" appear next to the entry for the 4100U Programmer.  (Id. at ISPI 0042; Ex. J at ISPI 0183.) Vance Butterfield, the former manager of SimplexGrinnell's service parts distribution center, testified that "SP" stood for "service part."  (Butterfield Trial Tr. 215.)

31.  SimplexGrinnell management considered the 4100U Programmer to be a "service part."  Capowski testified that disks containing the 4100U Programmer were "service parts." (Capowski Dep. 12-13.)

32.  Moreover, the 4100U Programmer falls within the plain meaning of the term "service part."  LoRocco credibly testified that the 4100U Programmer is necessary to servicing a customer site.  (LoRocco Trial Tr. 91-96.)  Although not necessary for performing standard maintenance and inspection of the fire alarm system (Capowski Trial Tr. 10), a Programmer is necessary to perform functions including changing the sequence of outputs (e.g., lights activating before alarms or vice versa) and altering the volume of a safety broadcast throughout the customer's system (LoRocco Aff. ¶ 9).  LoRocco also testified, and Capowski admitted, that a Programmer is necessary to correct certain bugs and error codes and to restore the system after a system crash.  (Capowski Trial Tr. 39-42; LoRocco Aff. ¶ 9; LoRocco Trial Tr. 91-96.)  These are clearly "service" functions in any ordinary sense of the term, and the 4100U Programmer is a "part" necessary to perform these functions.  Accordingly, even though not every service function requires the Programmer, it is a part necessary to meet customers' "service" needs.

33.  Finally, as the 4100 Programmer has the same function vis-a-vis a 4100 panel as does the 4100U Programmer to a 4100U panel, it would be illogical for one of the Programmer's to constitute a service part but not the other.  Thus, the finding, based on SimplexGrinnell's implicit concession, that the 4100 Programmer is a "service part" further compels the conclusion that the 4100U Programmer is also a service part.

D.   Copyright Registrations

34.  SimplexGrinnell entered into evidence the copyright registrations demonstrating it as the copyright owner for one version within each of revisions 8 through 11 of the 4100 and 4100U

10

Programmers.

35.  Version 8.04 was first published on June 30, 1999, and was registered with the United States Copyright Office effective September 23, 2005.  (Ex. 12.)

36.  Version 9.02 was first published on May 19, 2000, and was registered with the United States Copyright Office effective July 29, 2005.  (Ex. 13.)

37.  Version 10.01 – the first version of the 4100U software – was first published on March 27, 2001, and was registered with the United States Copyright Office effective July 29, 2005.  (Ex. 14.)

38.  Version 11.01 was first published on March 27, 2002, and was registered with the United States Copyright Office effective July 29, 2005.  (Ex. 19.)

39.  SimplexGrinnell also entered into evidence its application for copyright registration of version 12.01, which was submitted on January 8, 2008, and indicates that version 12.01 was first published on February 12, 2006.  (Exs. 23 & 24.)

40.  Although SimplexGrinnell asserts that revision 12 is registered, a search of the records of the United States Copyright Office indicates that neither version 12.01 nor any other version within revision 12 is registered.  Indeed, the search revealed that the above-referenced versions for which SimplexGrinnell has documented the registration (versions 8.04, 9.02, 10.01, and 11.01) are the only four versions of the programming software with existing copyright registrations.

**III.    ISPI's Access To and Use of the Programmers**

A.    Access

1.    Physical Access

41.  During the time ISPI functioned as the equivalent of a SimplexGrinnell branch office, it was provided with the branch releases of the Programmer software; thus, ISPI has had access to the early versions of the 4100 and 4100U Programmers since their initial releases.  (Guarino Trial Tr. 108-10, 124.)

42.  During the pendency of the Bankruptcy Proceedings, ISPI was further provided with newer revisions of the Programmer.  To comply with the preliminary injunction issued by the Bankruptcy Court in 2003, William Mitchell, who was at the time SimplexGrinnell's associate general counsel, provided ISPI with various disks containing all of the then-available versions of the software to date, consistent with materials that had been furnished to all SimplexGrinnell branch offices.  (Guarino Aff. ¶25; Mitchell P.I. Hr'g Tr. 210.)[3]

43.  Accordingly, ISPI was in possession of the 4100U Programmer at the time of the execution of the Bankruptcy Stipulation (Guarino Trial Tr. 123), although none of ISPI's existing customers had 4100U panels installed as of that time (see D. Proposed Findings ¶ 18).

2.    Website Access

44.  Throughout the years, as technology advanced, so did the means for obtaining software revisions.  Initially, the software was available on a floppy disk, and that eventually evolved to a compact disk.  Eventually, with an appropriate password, the 4100U Programmer could be downloaded from the internet through SimplexGrinnell's website.  (Barros Trial Tr. 71;

---

[3]  This appears to have provided ISPI with all versions through 10.03.  (Mitchell P.I. Hr'g Tr. 206, 210.)

Guarino Trial Tr. 134.)

45.   At some point prior to the execution of the Bankruptcy Stipulation, SimplexGrinnell provided Guarino with a password that allowed ISPI to access SimplexGrinnell's website to download revisions and updates to the 4100U Programmer.  (Guarino Trial Tr. 113; Guarino Aff. ¶ 26.)

46.   This password continued to work for some period of time following the execution of the Bankruptcy Stipulation, and with this password, ISPI continued to access SimplexGrinnell's website to download software revisions.  (Guarino Trial Tr. 133-34; Guarino Aff. ¶ 26.)  ISPI did not limit its use of the software downloaded from the website to the service of customers on the ISPI Customer List.  (See LoRocco Trial Tr. 80-81.)

47.   At some point in 2005 or 2006, SimplexGrinnell deactivated the password and cut off ISPI's access to the SimplexGrinnell website.  (Guarino Trial Tr. 133; Guarino Aff. ¶ 27.)

48.   Thereafter, SimplexGrinnell did not provide ISPI with alternative means to obtain new versions of the Programmer.  ISPI requested such products, but SimplexGrinnell did not provide them.  (Guarino Trial Tr. 134.)

49.   However, SimplexGrinnell never sought to have ISPI return the software it already possessed. (Guarino Aff. ¶ 30; Mitchell P.I. Hr'g Tr. 215-16.)

B.     Use With Existing Customers

50.   As noted above, SimplexGrinnell does not challenge ISPI's use of the 4100 Programmer for servicing customers on the ISPI Customer List, because the Bankruptcy Stipulation granted ISPI an implied limited license to do so.  SimplexGrinnell asserts, however, that this license extended only to the 4100 Programmer, and accordingly, it contends that ISPI is not authorized to use the 4100U Programmer for these (or any other) customers, and that such use

13

constitutes copyright infringement.

51.  SimplexGrinnell's allegations in the operative complaint concerning ISPI's use of the 4100U Programmer are limited to allegations concerning ISPI's use of this software at the Chrysler Building Complex and at Macy's Herald Square.  (First Am. Complt. ¶¶ 17-18.)[4]

52.  Both of these sites are on the ISPI Customer List.  (Ex E at ISPI 0030 (two entries for "Chrysler": one at 666 3rd Avenue, New York, and the other at 405 Lexington Avenue, New York); id. at ISPI 0031 (listing "Macy's East, Inc." located at 141 West 34th Street, New York).)

53.  ISPI does not dispute that it has used the 4100U Programmer at these locations. (Guarino Dep. 207.)

54.  SimplexGrinnell recently installed new 4100U panels at two sites on the ISPI Customer List for which ISPI continues to have active service contracts – Kayson 42 Operating Co. and Fox-5 News (Ex. E at ISPI 0030-31) – but SimplexGrinnell has refused to provide ISPI with the corresponding version of the Programmer necessary to program these panels.  (Guarino Aff. ¶¶ 97-99.)

C.    Use With New Customers

1.    Service at New Sites

55.  ISPI has serviced SimplexGrinnell equipment at a number of sites that were not part of its existing customer base at the time of the Bankruptcy Stipulation using various versions and revisions of the 4100 and 4100U Programmers.  These sites include the Hackensack Medical Center, Bergen Regional Medical Center, St. Joseph's Regional Medical Center, the Bergen

---

[4]  Although it was not mentioned in the amended complaint, SimplexGrinnell now includes claims of infringement at another site on the ISPI Customer List, the Morgan Post Office (Ex. E at ISPI 0031), based on Guarino's testimony that ISPI has used the 4100U Programmer there (Guarino Dep. 207).  (P. Mem. 11.)

County Vocational/Technical Schools, and the Atlantic City Hilton.  (See LoRocco Trial Tr. 82-86; Sarni Dep. 23-25.)[5]  None of these sites are on the ISPI Customer List.  (See Ex. E.)

56.  LoRocco has performed programming work at the Hackensack Medical Center on 4100 and 4100U systems using Programmer versions 8.06, 9.02, and 11.11.  (LoRocco Trial Tr. 82-83.)  LoRocco has also programmed systems – using unspecified versions of the Programmer – within either revision 8 or 9 at the Bergen Regional Medical Center, revision 8 (most likely version 8.04) at St. Joseph's Hospital, and either revision 10 or 11 at the Bergen County Vocational/Technical Schools.  (Id. 84-86.)  LoRocco has also programmed 4100 panels at the Bergen County Vocational/Technical Schools, but did not recall the revision used (though it must necessarily be revision 9 or earlier).  (Id. 86.)  Gerald Sarni, another ISPI technician, has programmed both 4100 and 4100U panels at the Atlantic City Hilton, but did not specify which revisions or versions he used.  (Sarni Dep. 23, 25.)

57.  Some of these customers had possession of the appropriate Programmer (and dongle) installed on the onsite GCC.  (E.g., Guarino Aff. ¶¶ 83, 85; LoRocco Trial Tr. 80.)  ISPI sometimes performed the programming work through these GCC network systems (using the Programmer in the customer's possession), and sometimes through an ISPI laptop computer brought to the site (which required use of software in ISPI's possession).  (E.g., LoRocco Dep. 27-30; LoRocco Trial Tr. 80-81.)

58.  For the most part, no evidence was presented concerning the time frame of ISPI's programming work at these new customer sites.  The one exception is that LoRocco testified he

_____

[5]  SimplexGrinnell did not include allegations with respect to any of these sites in the amended complaint.  As noted above, the allegations in the amended complaint are limited to Macy's Harold Square and the Chrysler Building.  Indeed, the amended complaint does not even allude to any additional instances of alleged infringement.

began doing service work at the Hackensack Medical Center in February or March 2005, and programmed panels at some point thereafter.  (LoRocco Trial Tr. 82.)  However, as these are "new" customers, all of this work necessarily occurred following the execution of the Bankruptcy Stipulation in early 2004.

59.  ISPI's ability to service some of these sites has been hindered following the installation of upgraded 4100U panels because SimplexGrinnell either will not provide ISPI with the corresponding programming software, or installed an extra security feature blocking ISPI's ability to program the panel.  (See Guarino Aff. ¶¶ 83 (Hackensack Medical Center), 85 (Bergen Technical Schools); LoRocco Aff. ¶¶ 14-15.)

## 2.    SimplexGrinnell's Letters to ISPI's New Customers

60.  In the summer of 2006, SimplexGrinnell wrote to two of ISPI's "new" customers – the Hackensack University Medical Center, and the Bergen Regional Medical Center.

61.  In July 2006, SimplexGrinnell wrote to Hackensack University Medical Center that it is the only authorized provider of SimplexGrinnell systems and – without referencing ISPI by name – advised that "there are other organizations that wrongly depict themselves as authorized to provide new Simplex systems or as having technicians with up-to-date factory training" and cautioned against obtaining servicing from companies other than SimplexGrinnell.  (Ex. CC.)

62.  Shortly thereafter, in August 2006, SimplexGrinnell wrote to the Bergen Regional Medical Center, conveying similar warnings against using non-SimplexGrinnell technicians.  The letter to the Bergen Regional Medical Center further noted that SimplexGrinnell understood that ISPI had made certain programming changes to Bergen Regional Medical Center's fire alarm system, and stated that "ISPI is not certified or authorized by SimplexGrinnell to work on Bergen Regional's systems."  (Id.)

16

IV.     **Other SimplexGrinnell Products**

63.   In addition to 4100U Programmer, ISPI alleges that SimplexGrinnell has failed to furnish it with other "service parts"since early 2006.

A.     Software Key/Dongles

64.   The parties agree that, as noted above, a software key, or dongle, is required to run SimplexGrinnell's panel programming software.  (Capowski Aff. at 2; Guarino Trial Tr. 122.) The dongle is a device that is physically plugged into the computer system a technician wishes to use to program the fire alarm system.  (Capowski Aff. at 2.)  "The key contains a code, proprietary to SimplexGrinnell, that the panel programming software must recognize before it will run."  (Id.)  It is, in effect, a security device that restricts access to the Programmers. (Capowski Dep. 98.)

65.   "The key is issued only to authorized SimplexGrinnell personnel or, as in this case, to authorized ISPI personnel, for use with SimplexGrinnell's copyrighted panel programming software and operates as a safeguard to assure that the panel programming software is being run only by authorized personnel."  (Capowski Aff. at 2.)

66.   Unlike the Programmers, a dongle is not revision-specific – a given dongle works across the various SimplexGrinnell systems and the various revisions and versions of the software within each system.  (Guarino Trial Tr. 122-23.)

67.   SimplexGrinnell contends that dongles are not "service parts" and that ISPI's admitted use of the dongles in programming SimplexGrinnell fire alarm panels (id. 122) constitutes the misappropriation of trade secrets.  Thus, SimplexGrinnell has refused to sell them to ISPI.

68.  On May 9, 2006, ISPI submitted a purchase order to SimplexGrinnell for, among other things, two keys with part number 740-989 – described as a "GCC /NPU Level 7 Key" – for use on jobs for 620 Management LLC and Time Warner, two sites on the ISPI Customer List. (Ex. Q; Guarino Aff. ¶ 62; Ex. E at ISPI0029.)

69.  SimplexGrinnell did not fill this order.  A letter dated October 12, 2006, from SimplexGrinnell's counsel to ISPI's counsel, asserts that though previously listed with a six-digit number, this item is not a "service part," but rather a "proprietary software key," whose "proper part number" is "0740-0989."  (Ex. S.)  The letter continues: "If it was sold to ISPI in the past as a service part, it was sold in error and arrangements should be made for its return.  The erroneous part number has been removed from the service parts list provided to ISPI."  (Id.)

70.  SimplexGrinnell's position is unsustainable.  A dongle, even though containing proprietary information, is a service part.

71.  First, nothing in the Bankruptcy Stipulation prevents a part containing proprietary information from being a "service part."

72.  Second, SimplexGrinnell cannot change the status of a product as a service part by re-designating the part number from 740-989 to 0740-0989.  Capowski, a SimplexGrinnell witness, testified that he understood dongles to be six-digit service parts (Capowski Dep. 99), and the 2008 Price List provided to ISPI lists another dongle, part number 741-727, next to the letters "SP" (Ex. J at ISPI 0183), which Butterfield testified stands for "service part."

73.  More fundamentally, in light of the finding above that the Programmers are "service parts," and the parties' agreement that a dongle is necessary for utilizing the Programmers, it is apparent that dongles must also be "service parts."

18

B.    <u>Test Tools</u>

74.   Guarino testified that test tools are necessary for testing and inspecting smoke detectors.  (Guarino Aff. ¶ 66.)  SimplexGrinnell did not attempt to refute that assertion or otherwise explain the function of these tools.

75.   Nevertheless, SimplexGrinnell has refused to supply such "test tools" to ISPI.   On October 4, 2006, ISPI submitted a purchase order to SimplexGrinnell for the purchase of, among other things, two "Smoke Test Tools" (part numbers 553-760 and 553-805) for use on a site listed on the ISPI Customer List, ATC Management.  (Ex. U; Ex. E at ISPI 0029.)

76.   SimplexGrinnell did not fill this order, stating that "Part Numbers 553-760 & 553-805 are not on the Repair Parts Retail Price list provided to ISPI."  (Ex. T.)  A handwritten note on the purchase order form states that the Smoke Test Tool is"no longer available to [ISPI]."  (Ex. U; Guarino Aff. ¶ 68.)

77.   SimplexGrinnell attempts to distinguish "service parts" from "technician tools."[6] Butterfield testified that, in his view and in the current view of SimplexGrinnell, a "service part" is a field replacement unit, or component, such as a smoke detector or a PC board, that a technician can replace to fix the customer system.  (Butterfield Trial Tr. 215.)  By contrast, Butterfield regards a "technician tool" as something that allows a technician to be able to perform some type of work.  (<u>Id</u>. at 216.)

78.   Although this distinction may be plausible in the abstract, it is not supportable in the context of the Bankruptcy Stipulation.  Under this definition, the Programmers would plainly be a

---

[6]  This argument was made with specific reference to the 4100U Programmer, but presumably SimplexGrinnell's attempt to distinguish "tools" from "parts" applies equally to "test tools."

"technician tool" rather than a service part – which is exactly the point Butterfield hoped to make through this testimony.  However, for the reasons already discussed, the evidence is overwhelming that the Programmers are "service parts."

79.  Likewise, although the test tools may fit into Butterfield's definition of a "technician tool," they are clearly "service parts" within the meaning of the Bankruptcy Stipulation.  Both parts were included on the price list provided to ISPI around the time of the Bankruptcy Stipulation and identified with their six digit product numbers (Ex. E at ISPI 0827); these tools are used in the "service" of customers in the ordinary construction of the term; and SimplexGrinnell apparently provided the tools to ISPI for a considerable period of time following the execution of the Bankruptcy Stipulation (as evidenced by the October 2006 notation – approximately two and a half years after the execution of the Bankruptcy Stipulation – that the test tools are "no longer available" to ISPI (Ex. U)).  All of these factors indicate that the test tools are service parts within the meaning originally intended by the parties to the Bankruptcy Stipulation.

## V.     ISPI's Advertising

80.  In promotional marketing e-mails and letters sent to potential clients in New York and New Jersey, ISPI advertised that it specialized in SimplexGrinnell fire alarm systems.  Through these promotional materials, as Guarino readily admits, ISPI represented that it was the only company other than SimplexGrinnell that had the ability to program SimplexGrinnell panels. (Guarino Trial Tr. 117-18.)

81.  ISPI further represented that it had the software necessary for programming SimplexGrinnell fire panels.  (Id. at 120-21.)  ISPI represented to numerous potential customers that it "possess[es] all the software necessary for programming."  (E.g., Exs. 48-56, 58-59, 62-66,

68-71, 74-77, 161-71, 173-79.)  On numerous occasions, without directly stating that it had access to all programming software, ISPI implied as much in touting to clients that it specialized in, among other things, "programming" Simplex systems.  (E.g., Exs. 124-60, 181-94.)  Many of these solicitations further stated that ISPI offered a better value and could provide substantial cost savings.  (E.g., Exs. 48-56, 58-59, 62-66, 68-71, 74-77, 124-71, 173-79, 181-94.)

82.  ISPI frequently stated that it "use[s] factory parts," (e.g., Exs. 48-56, 62-66, 161-71, 173-79), and on one occasion stated that ISPI has "direct access to parts and support from the factory" (Ex. 45).  It is possible to use factory parts without having direct access to them. Andrew Newman, a management consultant for ISPI (Neuman Dep. 17), testified that, independent of SimplexGrinnell's willingness to sell parts to ISPI, it was possible for ISPI to obtain SimplexGrinnell parts through various other companies over the internet.  (Id. 44-45.) SimplexGrinnell – although maintaining that it is the only authorized distributor – did not dispute that this is so.[7]

83.  In over 100 instances, in many of the same solicitations that stated that ISPI had possession of all necessary programing software,  ISPI further advertised that it had factory-trained technicians.  (Guarino Trial Tr. 120; Exs. 48-56, 58-59, 62-66, 68-71, 74-77, 161-71, 173-79.)  ISPI currently employs eight service technicians, at least three of whom were previously employed or trained by SimplexGrinnell.  (Guarino Aff. ¶ 52.)  Indeed, SimplexGrinnell provided certificates, evidencing training by SimplexGrinnell at some point during the 1990s and 2000s, to

---

[7]  A cursory google search reveals that it indeed appears possible to purchase SimplexGrinnell parts from third party sources.  E.g., Life Safety Consultants of Michigan, Inc, http://www.lifesafetycom.com/simplexpartsandcomponents.html (last visited March 31, 2009) (touting "New, reconditioned, hard to find, and discounted Simplex fire alarm and clock system parts are available at a substantial cost savings!"); Int'l Systems of Am., Inc., http://www.isa-net.com/parts-fire.html (last visited Mar. 31, 2009).

four technicians who subsequently worked for ISPI. (See Exs. 198-201 (certificates for Charles

LoRocco); Exs. 202-05 (certificates for Igor Miller); Exs. 206-07 (certificates for Olgierd

Marcinkiewicz); Ex. 208 (certificate for Gerald Sarni).)

84. Andrew Guarino credibly testified – and SimplexGrinnell did not attempt to refute –

that "much of the actual technical expertise and know-how needed to service, repair and maintain

a fire alarm system is learned in the field by 'hands on experience.'" (Guarino Aff. ¶ 53.)

## VI.  Evidence on Damages

### A.  SimplexGrinnell's Damages

85. SimplexGrinnell did not attempt to establish any actual damages with respect to any

of ISPI's challenged conduct.

### B.  ISPI's Damages

86. ISPI has failed to establish any injury flowing from SimplexGrinnell's failure to sell it

service parts or resulting from the letters SimplexGrinnell sent to ISPI's customers.[8]

87. Relying upon Guarino's affidavit, ISPI claims that its damages include "loss of a

major existing customer (Sunrise Senior Living Facilities in New Jersey), which accounted for

$175,000 of annual revenues[,] the imperiling of other existing customers in New York . . . which

account for $25,000 of annual revenues," as well its attorneys' fees and costs in pursuing this

litigation. (D. Mem. 9.)

---

[8] On the eve of trial, SimplexGrinnell moved to exclude all testimony or other evidence of ISPI's alleged damages. (Doc. #64.) Because the Court finds that ISPI has not proven any damages even if this evidence is taken into consideration, that motion will be denied as moot (although many of the points raised by SimplexGrinnell nicely highlight ISPI's failures of proof).

88. First, with respect to the Sunrise Senior Living Facilities, Guarino does not provide any facts or even allege that SimplexGrinnell in any way caused the loss of this account. (Guarino Aff. ¶ 96.) Rather, ISPI apparently attempts to establish damages by virtue of the fact that ISPI lost this account during the pendency of this litigation. (See id.)

89. Second, the allegation concerning the "imperiling" of other accounts is explicitly prospective; there is no claim that ISPI has, in fact, lost any opportunity or revenue with respect to these accounts. (See id. ¶ 97.)

90. Accordingly, ISPI has not demonstrated any actual damages.[9]

## VII.   Prior Proceedings

91. SimplexGrinnell initiated this action on April 3, 2007. Within a few months, it moved for a preliminary injunction prohibiting ISPI from copying and using the programming software and requiring it to surrender to plaintiff copies of certain software within its possession. Specifically, SimplexGrinnell relied upon ISPI's work at Macy's Herald Square and the Chrysler Building Complex, two of ISPI's existing customers. The Court held a hearing on the motion for a preliminary injunction on August 28 and 29, 2007. At the conclusion of the hearing, the Court issued on oral opinion denying the preliminary injunction, finding that SimplexGrinnell failed to

---

[9] Through its proposed findings (submitted prior to trial), apparently again intending to rely on Guarino's affidavit, ISPI also asserted that SimplexGrinnell's actions prevented ISPI from seeking new business, resulting in the loss of potential contracts worth $800,000 annually and that a continuation of SimplexGrinnell's refusal to provide service parts would compromise ISPI's entire SimplexGrinnell-related portfolio, which it values at approximately $2,400,000 annually. (D. Proposed Findings ¶¶ 54-56; see also Guarino Aff. ¶¶ 95, 100.) To the extent that ISPI seeks to include these figures in its alleged damages, the "evidence" presented in support of these contentions suffers from the same infirmities as the asserted damages already discussed: lack of causation with respect to the first contention, in this instance, through failure to present any facts (or even allege) that ISPI would have obtained the contracts if not for SimplexGrinnell's actions, and the entirely prospective nature of the second contention.

establish a likelihood of success on the merits that ISPI had infringed upon its copyrights at those two sites.

## CONCLUSIONS OF LAW

The heart of this case is SimplexGrinnell's claim that much of ISPI's use of the programmer infringes upon SimplexGrinnell's copyright.  This claim turns in some appreciable measure on the proper interpretation of the Bankruptcy Stipulation, and in particular, paragraph nine of the Stipulation.  The resolution of the remainder of the claims – misappropriation of trade secrets, unfair competition, and breach of contract – is largely dependent on the resolution of this copyright claim, and the attendant interpretation of the Bankruptcy Stipulation it requires.

## I.    Copyright Infringement Claim

1.  To establish a copyright infringement claim, a plaintiff must show "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991); accord, Lipton v. Nature Co., 71 F.2d 464, 469 (2d Cir. 1995).  Even where these elements are met, the existence of a license to engage in the challenged copying may be raised as a valid defense to the claim of infringement.  Tasini v. New York Times Co., Inc., 206 F.3d 161, 170-71 (2d Cir. 2000).  Where the parties dispute the existence of a license, the party claiming the benefit of the purported license has the burden to prove its existence.  Id. at 171.  Where the existence of the license is not in dispute, the copyright owner bears the burden to establish that the copying went beyond the scope of the license.  Id.

### A.    Ownership and Registration of a Valid Copyright

2.  "A certificate of copyright registration is prima facie evidence that the copyright is valid" and "that the work in question is copyrightable."  Fonar Corp. v. Domenick, 105 F.3d 99,

24

104 (2d Cir. 1997).[10]  However, although "[a]n author may have a copyright in all works of authorship regardless of whether he registers that copyright," Murray Hill Publ'ns, Inc. v. ABC Commc'ns, Inc., 264 F.3d 622, 630 n.1 (6th Cir. 2001), cited by In re Literary Works in Elec. Databases Copyright Litig., 509 F.3d 116, 124 n.5 (2d Cir. 2007), the Copyright Act imposes a registration requirement as a "statutory condition precedent" to bringing suit in federal court, In re Literary Works, 509 F.3d at 124.

3.  Section 411(a) of the Act provides that "no action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title."  17 U.S.C. § 411(a).  Where the work has not been successfully registered, a civil action for infringement may be brought upon preregistration "where the deposit, application, and fee required for registration have been delivered to the Copyright Office in proper form and registration has been refused," provided that "notice [of the action], with a copy of the complaint, is served on the Register of Copyrights."  Id.  This requirement is jurisdictional; if it has not been complied with in respect to a given work, a federal court is without subject matter jurisdiction to entertain any claim of infringement in that work.  In re Literary Works., 509 F.3d at 121-25.

4.  Registration of the original work of authorship does not extend to confer jurisdiction over claims of infringement in derivative works based upon that original work.  It is firmly established in this Circuit that "registration of a claim on an original work does not create subject matter jurisdiction with respect to a suit for infringement of the original's unregistered

---

[10]  At least with respect to registrations made within five years of first publication.  17 U.S.C. § 410(c).  For registrations made thereafter, "the evidentiary weight to be accorded to the certificate of registration . . . shall be within the discretion of the court."  Id.

derivative." <u>Well-Made Toy Mfg. Corp. v. Goffa Int'l Corp.</u>, 354 F.3d 112, 115 (2d Cir. 2003).

In <u>In re Literary Works</u>, the Second Circuit squarely rejected the argument that "if a plaintiff

brings a single claim based on a registered copyright, the district court acquires jurisdiction over

any and all related claims, even if those other claims arise from unregistered copyrights," 509

F.3d at 122, and reiterated <u>Well-Made Toy Mfg.'s</u> previous holding that a court does not have

jurisdiction to entertain a claim of infringement in an unregistered derivative work, even if that

claim is coupled with a claim of infringement in the validly registered original work, <u>id</u>. at 122-

23.

5.  Although the parties presented this issue in terms of SimplexGrinnell's copyright in the

various *revisions* of the Programmer, each new version constitutes a separate derivative work (<u>see</u>

Exs. 12-15, 23 (listing each registered version as a revised computer program that is a derivative

work of a previous version)), and thus the issue must be approached in terms of the validity of

SimplexGrinnell's ownership and registration of each *version* of the Programmer.

6.  As evidenced by the certificates of registration, SimplexGrinnell is the registered

copyright holder in versions 8.04, 9.02, 10.01 and 11.01 of the Programmer.  There is nothing

suggesting that SimplexGrinnell is not also the owner of valid copyrights in additional versions,

but as these are the only registered versions of the software – a fact of which the Court takes

judicial notice, <u>cf</u>. <u>Island Software & Computer Serv. Inc. v. Microsoft</u>, 413 F.3d 257, 261 (2d

Cir. 2005) (noting that district court is entitled to take judicial notice of copyright registrations

published in Copyright Office's registry) – the Court is without jurisdiction to entertain claims

based on alleged infringement of any other version.[11]

---

[11]  With respect to version 12.01 – for which SimplexGrinnell only submitted its
application for registration and for which the Copyright Office has no record of actual

B.      Each Use of the Programer Creates a Copy

7.   The parties do not dispute that ISPI has copied SimplexGrinnell's copyrighted

programming software through the use of these works.  The Court agrees.  To create a potentially

infringing "copy" within the meaning of the Copyright Act, 17 U.S.C. § 101, "the work must be

embodied in a medium, i.e., placed in a medium such that it can be perceived, reproduced, etc.,

from that medium (the 'embodiment requirement'), and it must remain thus embodied for a

period of more than transitory duration (the 'duration requirement')."  Cartoon Network LP,

LLLP v. CSC Holdings, Inc., 536 F.3d 121, 127 (2d Cir. 2008) (internal quotations omitted).  The

embodiment requirement is satisfied when a software program is loaded into a computer's RAM,

id. at 128, and Cartoon Network suggested that the duration requirement would be satisfied where

the program remained in the RAM for at least several minutes, id., or where the program

remained in the RAM until the computer is shut off, id. at 129-30 (finding embodiment for 1.2

seconds to be of insufficient duration).

8.   The use of the Programmer satisfies both of the requirements necessary to make a

statutory "copy": each time the Programmer is used, it is loaded into the RAM of a computer, and

remains there as long as the programming is being performed, which can last several minutes to

several hours.

---

registration – the Court is without jurisdiction for the dual reasons that SimplexGrinnell did not
submit the registration until January 2008, after the commencement of this action and the filing
of the operative complaint, see Country Road Music, Inc. v. MP3.com, Inc., 279 F. Supp. 2d
325, 332 (S.D.N.Y. 2003), and even if the filing properly preceded this action, there is no
evidence that SimplexGrinnell complied with Section 411(a)'s requirement of serving the
Register of Copyrights with notice of the action and a copy of the complaint, necessary to
commence a preregistration suit.

C.      Existence of a License

9.  As ISPI's use of the software necessary creates a copy of the Programmer, whether and to what extent ISPI's use constitutes copyright infringement turns primarily on the scope of authority conveyed by the Bankruptcy Stipulation.  SimplexGrinnell does not dispute that the Bankruptcy Stipulation grants ISPI a license to use copyrighted programming software, however, it asserts that this license only allows ISPI to use the 4100 Programmer for sites on the ISPI Customer List and does not allow ISPI to use the 4100U Programmer for any customers, new or old, because none of the existing customers had 4100U panels at the time of the agreement.  (P. Mem. 11.)  ISPI, by contrast, asserts that it has a license – through the Bankruptcy Stipulation and otherwise – which is all encompassing and allows it to use both the 4100 and 4100U Programmers for any and all customers.  (E.g., D. Mem. 19-23.)

1.      The Bankruptcy Stipulation Grants ISPI a License to Use Copyrighted Service Parts Only For Its Existing Customer Base

10.  The scope of the license conveyed by the Bankruptcy Stipulation is a question of contract interpretation.  Reinhardt v. Wal-Mart Stores, Inc., 547 F. Supp. 2d 346, 352 (S.D.N.Y. 2008).  "In New York,[12] if a contract is straightforward and unambiguous, its interpretation presents a question of law for the court to be made without resort to extrinsic evidence."  LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 205 (2d Cir. 2005).  "The determination of whether contract language is unambiguous is made by the court with reference to the contract alone."  Waldman ex rel. Elliott Waldman Pension Trust v. Riedinger, 423 F.3d

---

[12]  The Bankruptcy Stipulation is governed by New York law, pursuant to the choice of law provision in that agreement.  (Ex. D ¶ 20.)  The clause is valid, as New York bears a substantial relationship both to the parties and to the performance of the contract.  See Dessert Beauty, Inc. v. Platinum Funding Corp., 519 F. Supp. 2d 410, 419 (S.D.N.Y. 2007).

145, 149 (2d Cir. 2005).  The language is unambiguous is it "has a definite and precise meaning,

unattended by the danger of misconception in the purport of the [contract] itself, and concerning

which there can be no reasonable basis for a difference of opinion."  Metro. Life Ins. Co. v. RJR

Nabisco, Inc., 906 F.2d 884, 889 (2d Cir. 1990) (alteration in original).  "Language whose

meaning is otherwise plain is not ambiguous merely because the parties urge different

interpretations in the litigation."  Id.

   11.   Paragraph nine of the Bankruptcy Stipulation provides: "SimplexGrinnell shall sell

service parts (currently identified by SimplexGrinnell with a six-digit product identification

number), including 'patches' and 'fixes,' to [ISPI] for the Existing Customer Base . . . ."  (Ex. D ¶

9.)  This language is clear and unambiguous and is not quite what either party claims.  It grants

ISPI the right to purchase – and by implication to use – all "service parts" for its "existing

customer base," regardless of whether the customer required a particular service part at the time

of the Stipulation.  SimplexGrinnell must sell ISPI service parts, for use with customers on the

ISPI Customer List, without limitation on the types of service parts SimplexGrinnell must sell or

on the nature of the equipment owned by the existing customers in 2004.  Because the meaning of

the obligation is clearly spelled out within the four corners of the agreement, parol evidence about

the content of the negotiations or what either party subjectively intended to agree to is not

admissible.  See Reinhardt, 547 F. Supp. 2d at 352; Golden Bay Enters., Inc. v. Walmart Stores,

Inc., No. 00-CV-6977, 2008 WL 4453195, at *2 (E.D.N.Y. Sept. 30, 2008).

   12.   The finding that the programming software is a service part within the meaning of the

agreement thus largely resolves this issue.  The parties collectively expended much effort

addressing whether the 4100U Programmer is a "patch" or a "fix" of the earlier 4100

Programmer.  The clear text of paragraph nine of the Bankruptcy Stipulation obligates

SimplexGrinnell to provide ISPI with services parts including "patches" and "fixes." It is not clear from the text of the provision what the term "patches" and "fixes" is meant to include. However, what is significant is that the obligation is unambiguously *not* limited to patches and fixes. It encompasses *all* service parts – defined in part by reference to the six-digit number – including patches and fixes. Thus, even something that is not a patch or a fix must be sold to ISPI if it is a service part. Because the evidence overwhelming establishes that the 4100U Programmer is in itself a service part, whether or not it is also a patch or a fix is entirely irrelevant.

13.   If an item is a "service part" and if it is used for an "existing customer," then ISPI is entitled to purchase and licensed to use it, and SimplexGrinnell is required to sell it. The corollary is that SimplexGrinnell is not obligated to sell ISPI either (a) items that are not service parts (for use with any customer) or (b) any parts for new customers (service part or not). As a general proposition, this does not mean that ISPI cannot use service parts for new customers (or non-service parts for any customer); it means only that SimplexGrinnell is not required to provide them. However, where as here, a part is protected by another right such as copyright – or, as will be discussed below, trade secret law – ISPI's ability to use the part may be restricted absent some grant of authority from SimplexGrinnell.

14.   The Bankruptcy Stipulation provides precisely that authority with respect to protected service parts, for the limited purpose of servicing customers on the ISPI Customer List. As a result, because the Programmers are service parts, ISPI is entitled to purchase and use them for its customer base existing as of the time of the Stipulation and ISPI's attendant use of the Programmers in servicing customers on the ISPI Customer List infringes no copyright.

30

2.      The Bankruptcy Stipulation Does Not Give ISPI Any Rights With Respect to New Customers

15.  The Bankruptcy Stipulation unquestionably does not grant ISPI a license to use any of SimplexGrinnell's programming software for servicing customers that were not part of its "existing customer base" at the time of the Stipulation – i.e., customers on the ISPI Customer List.  This is clear from paragraph nine of the Stipulation, which states that SimplexGrinnell's obligation to sell service parts is limited to parts used in the service of ISPI's "Existing Customer Base."  There is no provision in the Bankruptcy Stipulation that grants ISPI a license to use programming software for any other customer.

16.  ISPI notes, correctly, that the Bankruptcy Stipulation does not explicitly preclude ISPI from using the Programmers with new customers.  However, a copyright holder does not need to explicitly prohibit third parties from using its copyrighted material; such a prohibition is the default under copyright law.  See 17 U.S.C. § 106 (granting copyright owner exclusive rights to, among other things, make reproductions of the work).

17.  Nevertheless, ISPI argues that the Bankruptcy Stipulation grants it a license to use the Programmers for new customers because "one of the chief underpinnings" of that agreement was that ISPI would continue to compete with SimplexGrinnell for new customers, and that it is "axiomatic" that ISPI could not compete for new business without the ability to use the Programmers.  (D. Mem. 14-15.)  The Stipulation makes no provision regarding ISPI's ability to compete with SimplexGrinnell for new business, and there is no evidence of any side agreement that does.  There is testimony that SimplexGrinnell did not understand the Bankruptcy Stipulation to "restrict or preclude ISPI from soliciting new customers."  (Mitchell P.I. Hr'g Tr. 215.)  Again, this is apparent from the face of the Stipulation; parol evidence of such an understanding is

superfluous.  However, the absence of a restriction on competition in the Stipulation does not establish an entitlement to compete on any specific terms.

18.  ISPI does not even attempt to substantiate its contention that it is "axiomatic" that it could not solicit new business absent a license to use the Programmers.  Indeed, there was ample testimony about tasks that ISPI service technicians could perform without this programming software.  (See, e.g., Capowski Trial Tr. 10.)  But even if it were true that the lack of the Programmers would inhibit ISPI's ability to compete successfully, the absence of a restriction on competition does not create an affirmative obligation on SimplexGrinnell to provide ISPI with the means to compete on advantageous terms.  The Bankruptcy Stipulation says what it says and nothing more, and ISPI has not proven the existence of any side agreements going beyond what it says.  The fact that the agreement contemplated that ISPI and SimplexGrinnell would be competitors for new customers for service business does not imply that SimplexGrinnell is required to help ISPI to compete against it.  Quite the contrary: if ISPI and SimplexGrinnell are competitors, that suggests that SimplexGrinnell will *not* provide new products that it develops to ISPI except insofar as it specifically agreed to do or insofar as SimplexGrinnell for its own reasons decides that it is advantageous to do so.

### 3.   No Implied License

19.  Beyond the Bankruptcy Stipulation, ISPI argues that it has an implied license to use service parts for new customers.  The grant of a license may be implied by "objective conduct that would permit a reasonable person to conclude that an agreement [to use copyrighted work] had been reached."  SHL Imaging, Inc. v. Artisan House, Inc., 117 F. Supp. 2d. 301, 317 (S.D.N.Y. 2000) (internal quotations omitted).  The particular circumstances of how and when ISPI contends that a license was implied are vague, but there appear to be essentially four

32

arguments.  None of them is meritorious.

20.  First, ISPI argues that it was granted a license prior to the Bankruptcy Stipulation, when ISPI was a distributor for SimplexGrinnell and when ISPI was provided with programming software without any limitation or restriction.  (D. Mem. 15.)  ISPI does not point to any specific conduct from which a license might be implied, but it is reasonable to infer – and SimplexGrinnell does not contest – that ISPI had an unrestricted license to use programming software when it was a SimplexGrinnell agent.  But whatever rights ISPI had by virtue of its role as agent were nullified by paragraph five of the Bankruptcy Stipulation, in which ISPI explicitly rejected "any and all agreements" with SimplexGrinnell "whether express or implied, based on any written or oral agreements, statements, or correspondence, course of conducts, or otherwise." (Ex. D ¶ 5.)  This rejection clearly terminates any licenses granted prior to the Bankruptcy Stipulation.

21.  Second, ISPI argues that it was granted an implied license after the Bankruptcy Stipulation, by virtue of the fact that SimplexGrinnell did not demand the return of the physical disks containing the programming software.  But, physical possession of a copyrighted work does not by itself entitle one to use that work however one wishes.  See 17 U.S.C. § 202 ("[O]wnership of any material object . . . does not of itself convey any rights in the copyrighted work embodied in the object.")[13]  Under certain circumstances, giving over a software disk might imply a general license to use such software, but not in the circumstances of this case.  ISPI, after all, did have and continues to have a right to use programming software with respect to customers on the ISPI Customer List, so SimplexGrinnell would not have been within its rights to demand the physical

_____

[13] Thus, ISPI's apparent argument that, at a minimum, its use of any programming software left by SimplexGrinnell at the customer sites is non-infringing also fails.

return of the disks containing that software.  The fact that SimplexGrinnell did not demand their return therefore cannot be construed as extending a license to use the software beyond the situations in which such use is authorized by the Bankruptcy Stipulation, particularly given the explicit rejection of any prior license agreements contained in the Stipulation.

22.  Third, ISPI argues that it was granted an implied license because ISPI continued to have access to the Programmers through the SimplexGrinnell website.  (D. Mem. 21.)  For the same reasons that the failure to request a return of the disks do not imply a license, neither does the failure to promptly deactivate ISPI's password.  Again, the fact that ISPI had physical access to the Programmers does not by itself imply an unrestricted license to use it.  Moreover, there is no evidence that SimplexGrinnell intended ISPI to have access to the website at all following the Bankruptcy Stipulation, rather than simply neglecting to turn off the access ISPI already had.  There is no credible evidence that SimplexGrinnell even knew that ISPI continued to have such access.  In light of the explicit rejection of all prior agreements in the Stipulation, the mere failure to turn off access does not permit a reasonable inference of an ongoing license to use the Programmers for new customers.

23.  Fourth,  ISPI argues that a license is implied by the fact that SimplexGrinnell knew about and acquiesced in its use of the Programmers.  A non-exclusive copyright license may be implied from "a lack of objection" where the copyright owner knows about the use of the work.  Keane Dealer Services Inc. v. Hartz, 968 F. Supp. 944, 947 (S.D.N.Y. 1997), quoting I.A.E., Inc. v. Shaver, 74 F.3d 768, 775 (7th Cir. 1996).  ISPI points to two letters sent by SimplexGrinnell in the summer of 2006 to two of  ISPI's new customers as evidence of SimplexGrinnell's knowledge of ISPI's use of programming software.  The letters refer generally to "nonqualified technicians chang[ing], alter[ing], modify[ing], or adjust[ing]" the customer's system, and one

34

letter refers specifically to ISPI having made "programming changes to one of the nodes on [a] fire alarm system." (Ex. CC.)  To that extent, the letters do suggest that, at least as of that time, SimplexGrinnell was aware that ISPI had and was using the Programmers for new customers. However, the letters clearly express SimplexGrinnell's view that ISPI is *not* authorized to perform such work.  Thus, the letters are flatly inconsistent with ISPI's argument that SimplexGrinnell intended, by a purported lack of objection, to grant ISPI a license to use the programming software.  Moreover, SimplexGrinnell commenced litigation against ISPI within nine months of sending these letters.  It is difficult to conclude from such a relatively short delay that SimplexGrinnell's lack of objection evidences acquiescence in ISPI's unauthorized use of the Programmers.

24.  Moreover, even if SimplexGrinnell had impliedly granted a license to use the Programmers for new customers by any of these means – by not demanding return of the disks, by failing to prevent access to the website, or by not explicitly demanding that ISPI cease using the software for new customers – SimplexGrinnell was and is free to revoke that license, and it is clear that SimplexGrinnell has done so.  Accordingly, even if there had been a implied grant of a license – which it has been determined there was not – it has by now been revoked.  Thus, any prospective right on the part of ISPI to the programming software is precluded by the fact that SimplexGrinnell may revoke any implied license at any time and manifestly has done so here.[14]

---

[14] Since, as discussed below, infra Part I.F, SimplexGrinnell may obtain in this action only prospective relief, and not damages for any past violations by ISPI, it is not necessary to decide whether that revocation would have occurred with the decision in 2005 to cut off ISPI's access to SimplexGrinnell's website, with the commencement of this lawsuit, or at some other time.

25.  ISPI argues that any license it received was irrevocable because it was supported by "the mutual exchange of consideration supporting the bankruptcy stipulation."  (D. Mem. 22.) Whatever consideration supported the stipulation is irrelevant, however, because, as already discussed, the stipulation did not grant a license to use the Programmers for new customers.  If any such license had been implied, it was implied after the entry of the stipulation.   The consideration supporting the Bankruptcy Stipulation thus cannot support a subsequent grant of an implied license.  Hence, SimplexGrinnell was free to revoke any implied license at any time.

D.   SimplexGrinnell is Not Estopped From Asserting Its Copyright Claims

26.  Finally, ISPI argues that even if it does not have a license to use the programming software, SimplexGrinnell should be estopped from asserting its copyright claim because of its prior conduct.  A copyright holder may be estopped from asserting a copyright claim where:

> (1) plaintiff had knowledge of the defendant's [infringing] conduct;
> (2) plaintiff either (a) intended that defendant rely on plaintiff's acts
> or omissions [suggesting authorization], or (b) acted or failed to act
> in such a manner that defendant had a right to believe it was
> intended to rely on plaintiff's conduct; (3) defendant was ignorant
> of the true facts; and (4) defendant relied on plaintiff's conduct to
> its detriment.

DeCarlo v. Archie Comic Publ'gs, Inc., 127 F. Supp. 2d 497, 509 (S.D.N.Y. 2001).  ISPI has not established a basis for estoppel.

27.  ISPI has not shown that SimplexGrinnell intended for ISPI to continue to use the Programmers for new customers; indeed, the letters to ISPI's customers warning them not to use ISPI to service their systems are inconsistent with such a conclusion.  Nor has SimplexGrinnell acted in a way that would reasonably cause ISPI to believe that it was authorized to use the programming software.  As noted above, physical possession of a copyrighted work does not result in a grant of any of the rights protected by copyright law.  See 17 U.S.C. § 202.  Moreover,

SimplexGrinnell's failure to demand the return of the disks containing the Programmers is entirely consistent with the fact that ISPI has the right to use such software for existing customers but not for new customers.[15]  The same is true with respect to its failure to turn off website access. The letters SimplexGrinnell sent to ISPI customers do seem to suggest that SimplexGrinnell was at least aware of ISPI's unauthorized use of the Programmers as of the summer of 2006.  Again, however, a nine month period between the time of such awareness and the initiation of this lawsuit is insufficient to establish that ISPI reasonably believed SimplexGrinnell intended it to continue its unauthorized usage.  Indeed, Guarino did not even testify that he believed that SimplexGrinnell intended to provide ISPI an unrestricted license to use the 4100U Programmer beyond the ISPI Customer List.

28.  Moreover, even if there were reasonable reliance, ISPI has not shown such reliance to be detrimental.  ISPI has derived significant revenue over the last four years from its unauthorized use of the Programmers for new customers.  To be sure, prohibiting ISPI from continuing to use the software for new customers will harm ISPI.  But there is no evidence that such prohibition would put ISPI in a worse place than if ISPI had never used the Programmers in this manner in the first place.  Hence, there is no detriment arising from any reliance by ISPI on SimplexGrinnell's purported assurances as opposed to detriment arising from ISPI's lack of legal entitlement to the software.  There is therefore no basis to hold that SimplexGrinnell is estopped from pursuing its copyright claim.

---

[15]  SimplexGrinnell maintains that ISPI did not have the right to use the 4100U Programmer at all, even with respect to existing customers.  Still, the failure to demand the disks' return does not suggest that ISPI would be reasonable in the belief that SimplexGrinnell intended ISPI to use those disks for servicing new customers in light of the clear demarcation in the Stipulation between existing and new customers.

E.    Application

29.  To recap, the foregoing establishes that ISPI infringes upon SimplexGrinnell's

copyright when it uses the Programmers for new customers, but not when servicing customers on

the ISPI Customer List.  The evidence presented establishes – and ISPI readily admitted – that

ISPI has used various versions of the Programmer at several sites not on the ISPI Customer List.

These uses are unauthorized and are infringing.

F.    Remedy

1.    Damages

30.  SimplexGrinnell now seeks statutory damages.  Such an award is not appropriate.  As

an initial matter, SimplexGrinnell did not seek damages at all as a remedy for infringement in the

original or amended complaint.  Not only that, but SimplexGrinnell's allegations of copyright

infringement were limited to Macy's Herald's Square and the Chrysler Building Complex, two

customers on the ISPI Customer List – for which ISPI's use of the copyrighted programming

software is authorized by the Bankruptcy Stipulation – and thus the purported instances of

infringement for which SimplexGrinnell now seeks damages are limited to use of the

Programmers with new customers, which were not actually alleged in the complaint and are

technically beyond the scope of this action.  Cf. Metito (Overseas) Ltd. v. General Elec. Co., No.

05 Civ. 9478, 2009 WL 399221, at *10 n.8 (S.D.N.Y. Feb. 18, 2009).

31.  Even if the relief now requested were within the scope of the complaint, damages

would still be inappropriate.  SimplexGrinnell has not attempted to establish any damages with

respect to unauthorized use of copyrighted material by ISPI but rather seeks statutory damages.

The Copyright Act allows the copyright owner to "elect, at any time before final judgment is

rendered, to recover, instead of actual damages and profits" statutory damages between $750 and

$30,000 per infringed work, increased to a maximum of $150,000 if the infringement is found to be willful.  17 U.S.C. § 504.  SimplexGrinnell accordingly asserts that it has established that ISPI has willfully infringed on its copyrights in revisions 8, 9, 10 and 11 of the Programmer and seeks the maximum $1500,000 per work for a total of $600,000.  (P. Mem. 3.)  There are several problems with this approach.

32.  As noted above, each *version* of the program is a "work" within the meaning of the Copyright Act and thus the analysis must be performed on a version – rather than revision – level.  Moreover, as also noted above, the Court only has jurisdiction over the claims of infringement in the registered works – versions 8.04, 9.02, 10.01, and 11.01.  Accordingly, the Court could not award damages for infringement of revision 11, unless the infringement was of the only registered version, version 11.01, within that revision.  The only evidence presented of ISPI's use of particular versions of the software in servicing new customers was the use of versions 8.06, 9.02, and 11.11 at the Hackensack Medical Center, and likely use of version 8.04 at St. Joseph's Hospital, two of which are registered (8.04 and 9.02) and two of which are not (8.06 and 11.11).  Thus, the claim is reduced to one of infringement in versions 8.04 and 9.02.

33.  The registrations, or lack thereof, preclude an award of damages in yet another way.  Section 412 bars an award of statutory damages (or attorney's fees) under the Act for "any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work."  17 U.S.C. § 412.  Each of the four registered versions of the Programmer were registered with the Copyright Office at some point in 2005, ranging from three to six years after that version's first publication.  Accordingly, since the copyrights were not registered within three months of publication, unless the work was registered prior to the first act

of infringement, SimplexGrinnell must prove actual damages with respect to any infringement of that work (which, again, it did not even attempt to do).

34.   Finally, plaintiff bears the burden of demonstrating its entitlement to statutory damages, Pearson Educ., Inc. v. Liao, No. 07-Civ-2423, 2008 WL 2073491, at *4 (S.D.N.Y. May 13, 2008), and it is thus incumbent upon plaintiff to establish "by what acts" and "at what time defendant infringed [plaintiff's] copyright." BroadVision Inc. v. General Electric Co., No. 08 Civ. 1489 (WHP), 2008 WL 4684114, at *2 (S.D.N.Y. Oct. 15, 2008) (discussing general copyright pleading requirements).  Plaintiff has failed to demonstrate that the infringed-upon works had been registered by the time of first infringement, as necessary for an award of statutory damages.  Versions 8.04 and 9.02 were registered on September 23, 2005, and July 25, 2005, respectively, and there is no evidence that the first infringing use occurred after those dates. Indeed, the closest SimplexGrinnell came to showing the time period of the infringement is that ISPI used the Programmer at Hackensack Medical Center possibly as early as February 2005 – i.e., several months prior to registration.  For all of the above reasons, damages are inappropriate.[16]

---

[16]   Likewise, SimplexGrinnell's request that the Court to exercise its discretion to award SimplexGrinnell costs and attorney's fees pursuant to 17 U.S.C. § 505 is denied.  While SimplexGrinnell has demonstrated that ISPI has used (and in using made copies of) SimplexGrinnell's copyrighted software beyond its rights to do so under the Bankruptcy Stipulation, for the technical reasons set forth above it has largely failed to establish specific acts of infringement.  Moreover, in large measure this case is a battle over the proper interpretation of the Bankruptcy Stipulation, and in that battle each side has prevailed in part.  Under the circumstances, neither side is easily characterized as a prevailing party, and the most equitable solution is for each party to bear its own litigation costs.

2.    Injunction

35.   The Copyright Act provides that a court may grant permanent injunctive relief "on such terms as it may deem reasonable to prevent or restrain infringement."  17 U.S.C. § 502(a).  However, "an injunction does not automatically follow a determination that a copyright has been infringed, [eBay Inc. v. MercExchange, LLC], 547 U.S. 388, 392-93 . . .  (2006), and a copyright plaintiff seeking a permanent injunction still must satisfy the traditional four-factor test" for obtaining such relief.  Warner Bros. Entm't v. RDR Books, 575 F. Supp. 2d 513, 551 (S.D.N.Y. 2008).  The relevant factors are: (1) irreparable injury; (2) inadequate remedies at law to compensate for that injury; (3) the balance of hardships between the parties makes an equitable remedy warranted; and (4) that the public interest would not be disserved by such injunction.  Id., citing Amoco v. Prod. Co. v. Gambell, 480 U.S. 531, 542 (1987); Weinberger v. Romero-Barcelo, 456 U.S. 305, 311-13 (1982).

36.   Those factors are established here.  First, irreparable injury may generally be presumed "when a copyright plaintiff makes a prima facie showing of infringement."  Warner Bros. Entm't, 575 F. Supp. 2d at 552 (quoting ABKCO Music, Inc. v. Stellar Records, Inc., 93 F.3d 60, 66 (2d Cir. 1996)) (noting that the presumption still applies in this Circuit following the Supreme Court's decision in eBay).  Second, there is ample evidence to suggest that ISPI would continue to engage in unauthorized use of the Programmers to service new customers absent an injunction, making any remedy at law inadequate.  Warner Bros Entm't, 575 F. Supp. 2d at 553.  Third, defendant has not identified any hardship it would suffer if infringing uses of the Programmer were enjoined beyond the legally unprotected "hardship" of loss of ability to engage in unauthorized conduct and the concomitant business opportunities that such unauthorized activities may provide.  Warner Bros. Entm't, 575 F. Supp. 2d at 553.  Fourth and finally, there is

41

no public harm in preventing ISPI from using SimplexGrinnell's copyrighted software.  Fire

alarm systems will still be able to be fully serviced and maintained – undoubtedly a great public

benefit – even if ISPI's competitive position in the market for such services is weakened.

37.  Moreover, "[i]n the copyright realm, it has been said that an injunction should be

granted if denial would amount to a forced license to use the creative works of another."

Silverstein v. Penguin Putnam, Inc., 368 F.3d 77, 84 (2d Cir. 2004).  This is precisely the

situation here.  Thus an injunction is generally appropriate.

38.  The injunction, however, will only extend to those works – i.e., the particular versions

of the Programmer – over which the Court has proper subject matter jurisdiction.  Although the

Second Circuit has noted that other Circuits have allowed injunctions to issue against unregistered

works where defendant had "engaged in a pattern of infringement of plaintiff's registered

copyrights and can be expected to continue to infringe new copyrighted material emanating in the

future from the plaintiff" and that this "sort of prophylactic relief furthers the purposes of the

Copyright Act generally and does not undermine the intended effect of [the registration

requirement]," it was nevertheless explicit that it has "never held that a district court may enjoin

the infringement of unregistered copyrights so long as the underlying action arises from a

registered copyright held by the same party."  In re Literary Works, 509 F.3d at 123.  That is the

law of this Circuit, and that is the law by which this Court must abide.  A permanent injunction

will issue against ISPI's unauthorized use of the registered versions of the programming software

and none others.[17]

---

[17]  Although an award of damages is inappropriate, in part, as beyond the scope of the
complaint for failure to allege any uses ultimately found to be infringing, injunctive relief is
nevertheless appropriate as the complaint broadly sought to enjoin further infringing activities.
(First Am. Complt. ¶ 29.)  Moreover, although SimplexGrinnell did not necessarily establish

39.  That is not to say that SimplexGrinnell is entirely without remedy as to ISPI's unauthorized use of other versions.  Now that the meaning of the Bankruptcy Stipulation is authoritatively established, ISPI is on clear notice that it may not use SimplexGrinnell's proprietary software beyond the limits set forth in this opinion.  Provided that SimplexGrinnell register its copyrights, therefore, should ISPI engage in further infringement of versions not covered by this injunction, injunctive relief, and possible damages in significant amount, may follow.  There is thus an adequate deterrent to future abuse by ISPI of copyrighted materials.  Moreover, as discussed below, there is an equivalent mechanism to preclude unauthorized use of the Programmer – by precluding use of the software key necessary to access the software.

## II.    Misappropriation of Trade Secret Claim

40.  SimplexGrinnell alleges that ISPI misappropriated its trade secrets through use of the dongle and seeks an injunction against such use.  This claim is essentially an appendage of the main copyright infringement claim concerning ISPI's use of the Programmers, as the only purpose of the dongle is to gain access to the programming software.  Accordingly, to the same extent that the Bankruptcy Stipulation grants ISPI the right to use the Programmers – that is, for customers on the ISPI Customer List and no others – ISPI's use of the dongle cannot misappropriate anything in any way.  This result is confirmed by the finding that the dongle is itself a service part.  This conclusion reduces the claim to one concerning ISPI's use of the dongle to enable it to perform unauthorized programming for new customers.  Such use misappropriates SimplexGrinnell's trade secrets and will be enjoined.

---

significant infringement in the versions over which the Court has jurisdiction, for the purposes of granting injunctive relief, it is appropriate to look to the overall pattern of unauthorized use of the software as a whole, rather than slicing and dicing apart which version was used when.

41.  As an initial matter, because misappropriation of trade secrets is a state law claim, it must first be determined which state's laws to apply.  Since this claim – like all others in this litigation – is dependent on the meaning of the Bankruptcy Stipulation, New York law governs. "To succeed on a claim for the misappropriation of trade secrets under New York law, a party must demonstrate (1) that it possessed a trade secret, and (2) that the defendant used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means."  N. Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 43-44 (2d Cir. 1999).

A.      The Dongles Are SimplexGrinnell Trade Secrets

41.  The software keys, although "service parts," are also trade secrets.  "A trade secret is any formula, pattern, device or compilation of information which is used in one's business and which gives the owner an opportunity to obtain an advantage over competitor who do not know or use it."  N. Atl. Instruments, 188 F.3d at 44 (internal punctuation omitted).  "New York courts have recognized that computer software, or programs, can be a trade secret."  LinkCo, Inc. v. Fujitsu, Ltd., 230 F. Supp. 2d 492, 498 (S.D.N.Y. 2002).  The most important consideration in the determination of whether something constitutes a trade secret is whether the information is kept secret, Lehman v. Dow Jones & Co., 783 F.2d 285, 298 (2d Cir. 1986); Medtech Prod., Inc. v. Ranir, Inc., __ F. Supp. 2d __, 2008 WL 4525510, at *4 (S.D.N.Y. Sept. 30, 2008), and the "[p]rimary consideration in determining secrecy is whether the information is ascertainable by the public," LinkCo, Inc., 230 F. Supp. 2d at 499.

43. ISPI has not contested SimplexGrinnell's assertion that the dongles are trade secrets, and under this definition they clearly are.  As computer software can constitute a trade secret, so, it follows, can the code embedded in the dongles.  Further, SimplexGrinnell uses the dongles to restrict access to the Programmers and, although the dongles are not kept secret in the strictest

sense (as they are sometimes left at the customer site), they are only provided to authorized users of SimplexGrinnell's proprietary systems and not available to the public at large.

B.    ISPI Misappropriated the Dongles

44.   Nor does ISPI seriously dispute that unauthorized use of the Programmers would constitute misappropriation.  Rather, ISPI maintained throughout this litigation that it was entitled to use the Programmers – and by implication the dongles – in servicing any and all customers. That position has already been conclusively refuted and ISPI's use of the dongles in servicing new customers is unsupportable.

45.   ISPI has plainly used the dongles in breach of a confidential duty.  ISPI was provided the dongles for use attendant to its authorized programming functions, first while ISPI was an agent of SimplexGrinnell and later pursuant to the Bankruptcy Stipulation's implicit grant of authorization for ISPI to use the dongles (and Programmers) in servicing customers on the ISPI Customer List.  ISPI, however, has taken the dongles obtained pursuant to this confidential relationship, and has unequivocally used them for purposes beyond those authorized by using them in aid of the service of new customers.

C.    No Preemption

46.   The Copyright Act preempts parallel claims when "(1) the particular work to which the claim is being applied falls within the type of works protected by the Copyright Act . . . , and (2) the claim seeks to vindicate legal or equitable rights that are the equivalent to one of the bundle of exclusive rights protected by the copyright law . . . ."  Orange County Choppers v. Olaes Enters., Inc., 497 F. Supp. 2d 541, 554-55 (S.D.N.Y. 2007), quoting Briarpatch Ltd., L.P. v. Pheonix Pictures, Inc., 373 F.3d 296, 305 (2d Cir. 2004), citing in turn 17 U.S.C. § 301(a). Although it is unclear if the dongle itself – which contains some form of computer code – would

satisfy the first "subject matter" requirement, as the parties neither addressed this issue nor

explored the nature of the dongles in depth, even if it did, this claim would not be preempted.  For

although the rights SimplexGrinnell seeks to enforce through this claim largely parallel those it

sought to protect through the copyright infringement claim – namely, the right to preclude

unauthorized use of the Programmers – "[t]rade secret claims are not preempted by copyright law

because the requirement that plaintiff prove that the defendant used the trade secret in breach of a

duty constitutes the 'extra element' that distinguishes trade secret causes of action from pure

copyright causes of action."  Jamison Bus. Systems, Inc. v. Unique Software Support Corp., No.

CV 02-4887, 2005 WL 1262095, at *18 (E.D.N.Y. May 26, 2005), citing Computer Assocs. Int'l,

Inc. v. Altai, Inc., 982 F.2d 693, 717 (2d Cir. 1992); accord, Integrative Nutrition, Inc. v.

Academy of Healing Nutrition, 476 F. Supp. 2d 291, 297 (S.D.N.Y. 2007) ("[U]nfair competition

claims based upon breaches of confidential relationships, breaches of fiduciary duties and trade

secrets have been held to satisfy the extra element test and avoid § 301 preclusion.").

    47.  Indeed, the rationale for finding trade secret claims not preempted is nicely

underscored by the facts of this case where, although ISPI has admittedly engaged in rampant

unauthorized use of the Programmers, the primary claims of copyright infringement are largely

irremediable.  As stated by the Second Circuit:

> Trade secret protection . . . remains a "uniquely valuable" weapon
> in the defensive arsenal of computer programmers.  Precisely
> because trade secret doctrine protects the discovery of ideas,
> processes and systems which are explicitly precluded from
> coverage under copyright law, courts and commentators alike
> consider it a necessary and integral part of the intellectual property
> protection extended to computer programs.

Computer Assocs. Int'l, 982 F.2d at 717 (internal citations omitted).  Here too, it is only through

the parallel misappropriation claim that SimplexGrinnell can vindicate its rights to prevent the

unauthorized usage of the programming software.

      D.    <u>Remedy</u>

48.  As seen above, <u>supra</u> Part I.F., the only real impediment to the issuance of a more robust injunction against ISPI's continued use of the Programmers directly was the Court's lack of jurisdiction over the bulk of the works.  However, that does not negate the fact that the balance of equities would have otherwise warranted such an injunction.  For the same reasons that an injunction directly against use of any version of the Programmer to service new customers would have been an appropriate remedy – namely, the existence of irreparable injury, an inadequate remedy at law, balance of hardships in favor of plaintiff, and lack of harm to the public – an injunction against unauthorized use of the dongles is appropriate.

49.  The only factor it is necessary to revisit now is that of irreparable injury.  The Second Circuit recently held that it is not appropriate to presume irreparable injury, a necessary prerequisite to the issuance of an injunction, "[w]here a misappropriator seeks only to use [trade] secrets – without further impairment or irreparable impairment in value – in pursuit of profit." <u>Faiveley Transp. Malmo AB v. Wabtec Corp.</u>, ___ F.3d ___, 2009 WL 636020, at *6 (2d Cir. Mar. 9, 2009).  The rationale for this was twofold: first, "an award of damages will often provide a complete remedy for such an injury" because where there is no danger of further dissemination of the information, "the only possible injury that the plaintiff may suffer is loss of sales to a competing product which should be fully compensable by money damages," <u>id.</u> (internal punctuation omitted), and second, "the misappropriator will often have the same incentive as the originator to maintain the confidentiality of the secret in order to profit from the proprietary knowledge," <u>id.</u>  Having found that no presumption of irreparable injury could be applied, <u>Faiveley</u> reversed the district court's grant of a preliminary injunction for lack of actual evidence

47

of irreparable harm, focusing on the same fact that made the presumption inappropriate in the first instance: that the misappropriator was not disseminating the secret, but rather using it to advance its own business interests.  Id. at *6-7.  Although the same is true here (and, more generally, the facts of Faiveley are quite similar to those presented here – in that they both involve claims that a former business ally is continuing to use proprietary information of the other in ways currently unauthorized as beyond the bounds of an agreement), in this case, irreparable injury to SimplexGrinnell would in fact occur absent an injunction.  Here, it is not so much the value of the secrets contained in the dongle itself that need protection, but the Programmers which, as seen above, must piggyback on this claim.  As noted above, irreparable injury may be presumed from the infringement of a copyright and, moreover, there is ample evidence that ISPI would continue to engage in the unauthorized usage of both the software and the dongles absent an injunction.

50.  Accordingly, ISPI will be enjoined from using the dongles to perform programming work for customers not on the ISPI Customer List.  This relief is appropriately "narrowly tailored to fit specific legal violations" and properly avoids "unnecessary burdens on lawful commercial activity."  Faiveley Transp. Malmo, 2009 WL 636020, at *6, quoting Waldman Publ'g Corp. v. Landoll, Inc., 43 F.3d 775, 785 (2d Cir. 1994).

## III.   Unfair Competition

51.  SimplexGrinnell also charges ISPI with unfair competition – through both false designation of origin and false advertising – for alleged misrepresentations in ISPI's advertising under section 43(a) of the Lanham Act.  SimplexGrinnell further asserts that, to the extent its Lanham Act claims fail, Section 349 of the New York General Business Law prohibits the same

48

conduct.  (P. Mem. 21 n.30.)[18]

    A.    <u>No Preemption</u>

    52.  As an initial matter, ISPI argues that these claims are preempted by the Copyright

Act.  It is wrong.  Although certain Lanham Act or other unfair competition claims may indeed by

preempted, "claims that allege a false designation of origin or false advertising 'are not asserting

rights equivalent to those protected by copyright and therefore do not encounter preemption.'"

<u>Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.</u>, 155 F. Supp. 2d 1, 25 (S.D.N.Y. 2001)

(quoting <u>Warner Bros. Inc. v. Am. Broad. Cos., Inc.</u>, 720 F.2d 231, 246 (2d Cir. 1983)), <u>aff'd</u> 277

F.3d 253 (2d Cir. 2002); <u>see also</u> <u>Ronald Litoff, Ltd. v. Am. Exp. Co.</u>, 621 F. Supp. 981, 986

(S.D.N.Y. 1985) (false advertising claim under New York general business law not preempted).

    B.    <u>False Designation of Origin</u>

    53.  Next, although SimplexGrinnell lumps together both of its Lanham Act claims – that

of false designation of origin under 15 U.S.C. § 1225(a)(1)(A) and false advertising under 15

U.S.C. § 1225(a)(1)(B) – "into a generalized unfair competition claim," these "claims are distinct,

<u>Resource Developers, Inc. v. Statute of Liberty-Ellis Island Found., Inc.</u>, 926 F.2d 134, 139 (2d

Cir. 1991); <u>Johnson & Johnson v. Carter-Wallace, Inc</u>, 631 F.2d 186, 188 (2d Cir. 1980), and

require separate consideration."  <u>Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.</u>, 277

F.3d 253, 259 (2d Cir. 2002).  The former "ordinarily addresses confusion caused by a

defendant's trademark," <u>Nadel v. Play-By-Play Toys & Novelties, Inc.</u>, 208 F.3d 368, for

---

    [18] Additionally, SimplexGrinnell previously asserted alleged that this conduct also constituted unfair competition under New York common law.  SimplexGrinnell does not pursue this claim in its post-trial briefing, and in any event, claims of "unfair competition under New York common law mirror the Lanham Act claims."  <u>Real News Project, Inc. v. Indep. World Television, Inc.</u>, No. 06 Civ. 4322, 2008 WL 2229830, at *6 (S.D.N.Y. May 27, 2008).

example, through claims of "passing off" another's product as one's own, see Microsoft Corp. v.

AGA Solutions, Inc., 05 Cv. 5796, 2007 WL 777756, at *5-6 (E.D.N.Y. Mar. 12, 2007) ("Section

43(a) of the Lanham Act is a broad federal unfair competition statute" that "protects against false

advertising, passing off, and 'reverse passing off.'").  That is not the case here.

SimplexGrinnell's section 1125(a)(1)(A) claim appears to be based on the notion that ISPI

"misled its intended audience into believing that [it] was . . . a full and complete substitute for

SimplexGrinnell."  (P. Mem. 20.)   However,  "[i]mproperly marketing [defendant's product] by

creating the false impression of a link between [defendant's product] and [plaintiff's product] is a

false claim about the [defendant's product], actionable as false advertising.  Such marketing is not

a representation that the [defendant's product] has originated with [plaintiff]."  Twentieth Century

Fox, 277 F.3d at 260.  Accordingly, the claim under section 1125(a)(1)(A) will be dismissed.

       C.    <u>False Advertising</u>

    54.   To establish a false advertising claim under the Lanham Act, a plaintiff "must

demonstrate that the message in the challenged advertisement is false.  Falsity may be established

by proving that (1) the advertising is literally false as a factual matter, or (2) though the

advertisement is literally true, it is likely to deceive or confuse consumers."  Lipton, 71 F.3d at

474; accord, Societe Des Hotels Meridian v. LaSalle Hotel Operating P'Ship, L.P., 380 F.3d 126,

132 (2d Cir. 2004).  Where a statement is literally false, a court "may grant relief without

reference to the advertisement's [actual] impact on the buying public."  Time Warner Cable, Inc.

v. DIRECTV, Inc., 497 F.3d 144, 153 (2d Cir. 2007) (alteration in original), quoting Coca-Cola

Co. v. Tropicana Prods., Inc., 690 F.2d 312, 317 (2d Cir. 1982). By contrast, "a district court *must*

rely on extrinsic evidence [of consumer deception or confusion] to support a finding of an

implicitly false message."  Id. (alteration in original), quoting Schering Corp. v. Pfizer Inc., 189

F.2d 218, 229 (2d Cir. 1999).

      55.  In addition to proving falsity, the misrepresentation must be of "an inherent quality or characteristic of the product."  Nat'l Lighting Co., Inc. v. Bridge Metal Industries, LLC, __ F. Supp. 2d __, 2009 WL 603163, at *7 (S.D.N.Y. Mar. 4, 2009), quoting Nat'l Basketball Ass'n v. Motorola, Inc., 105 F.3d 841, 855 (2d Cir. 1997).  Finally, the representations must have been "part of an organized campaign to penetrate the relevant market.  Proof of widespread dissemination within the relevant industry is a normal concomitant of meeting this requirement."  Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., 314 F.3d 48, 49 (2d Cir. 2002).

      56.  SimplexGrinnell does not attempt to establish any actual consumer confusion but instead claims that ISPI engaged in advertising that was literally false.  The Second Circuit's opinion in Time Warner Cable guides the analysis of literal falsity.  After dissecting two of its prior decisions, Am. Home Prods. Corp. v. Johnson & Johnson, 577 F.2d 160 (2d Cir. 1978), and Avis Rent A Car System, Inc. v. Hertz Corp., 782 F.2d 381 (2d Cir. 1986), the Court adopted the "false by necessary implication" doctrine, under which "a district court evaluating whether an advertisement is literally false must analyze the message conveyed in full context" and find literally falsity where "the words or images, considered in context, necessarily imply a false message."  Time Warner Cable, 497 F.3d at 158 (internal quotations omitted).  Thus, a message can be "literally false," even if "no combination of words" on the page is untrue, if the clear meaning of the statement, considered in context, is false.  Id. 154-55.  To be literally false, however, the message must be unambiguous; if the representation "is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false" and the advertisement is actionable under the Lanham Act only upon a showing of actual consumer confusion.  Id. at 158.

57.  So, for example, <u>Time Warner Cable</u> explained that the advertisement at issue in <u>Avis Rent A Car</u>, which involved a claim by Avis that Hertz Corporation's advertisement stating that "Hertz has more new cars than Avis has cars," viewed properly in context, unambiguously referred to just the rental car fleet – rather than the fleet of total cars (which would also include cars for sale) – since the companies both made their reputations as rental car companies, the advertisement was published in sources that would come to the attention of prospective renters, rather than purchasers, and the advertisement elsewhere referred to renting cars.  <u>See</u> <u>Time Warner Cable</u>, 497 F.3d at 156-58.  Thus, Hertz's advertisement was not literally false, even though Hertz had fewer total cars than did Avis, because the context clearly indicated that Hertz was claiming to have more rental cars than Avis, a proposition which was true.  <u>Id</u>.  Likewise, <u>Time Warner</u> upheld the district court's finding of literal falsity in DIRECTV's advertisement that "settling for cable [television] would be illogical," because the context conveyed the unambiguous (false) message that DIRECTV's picture quality is superior to that of cable television.  <u>Id</u>. at 158.

58.  A similar analysis applies to ISPI's representations that it "has direct access to parts and support from the factory" (Ex. 45), and possesses "all the software necessary for programming" (<u>e.g.</u>, Ex. 48).  ISPI admits that it made such representations, but defends against the unfair competition charges on the grounds that the statements "were consistent with ISPI's entitlements under the Bankruptcy Stipulation."  (D. Mem. 29.)   ISPI's position has already been determined to be erroneous.  Accordingly, although these representations are true with respect to customers on the ISPI Customer List, the advertisements are false by implication because, viewed in context, the message asserted is unambiguous that ISPI would have such access to these parts and services with respect to the new customers to whom the advertisements were directed.  These

sorts of statements – regarding direct access to factory parts and services, and the Programmers – concern an inherent quality about the services ISPI purports to offer and satisfies the materiality requirement.  The representations regarding access to the Programmers were made broadly to many potential customers such that, although these misleading statements were not made in all solicitations to potential customers, they have nonetheless sufficiently penetrated the relevant market to be actionable.  (E.g., Exs. 48-56, 58-59, 62-66, 68-71, 74-77, 161-71, 173-79; see also e.g., Exs. 124-60, 181-94 (advertising that ISPI specializes in programming Simplex systems).) On the other hand, the statement that ISPI has "direct access to parts and support" was not broadly made, and thus having been said to a single potential customer in New Jersey (Ex. 45), this statement cannot support a Lanham Act violation.[19]

59.  SimplexGrinnell also contends that ISPI's reference to having "factory trained technicians" is false because, although the technicians were, in fact, factory-trained by SimplexGrinnell, their training was out of date.  These statements are not literally false – a number of ISPI's technicians were indeed factory-trained and there is nothing in the context of the message as a whole suggesting that the technicians had the most up-to-date training.  Nor is the alleged misrepresentation regarding the technicians' training material.[20]

---

[19]  Nor can it support a claim under Section 349 of the New York General Business Law. The reach of that provision is explicitly limited to the deception of consumers occurring in New York.  Goshen v. Mutual Life Ins. Co. of New York, 98 N.Y.2d 314, 325 (2002).  It is not sufficient that a marketing plan originates in New York if the consumer deception occurs elsewhere.  Id. at 324-25.  The statement concerning direct access to parts and services was sent to a potential customer in New Jersey and is thus outside the bailiwick of the New York statute.

[20]  Claims under Section 349 of the New York General Business Law also require materiality, and thus these alleged misrepresentations fail under New York law as well.   See In re Evergreen Mut. Funds Fee Litig., 423 F. Supp. 2d 249, 264 (S.D.N.Y. 2006) (one of three elements of claim under is that the "act or practice is misleading in a material respect").  For this reason also, ISPI's claim to a single customer in New Jersey that its technicians were factory

60. Accordingly, ISPI's representations concerning the programming software are in violation of the Lanham Act, but the other statements SimplexGrinnell complains of are not.[21]

D.     Remedy

61. SimplexGrinnell requests injunctive relief prohibiting ISPI from making these false representations and requiring ISPI to issue corrective correspondence.  The Lanham Act empowers courts to grant injunctions to prevent false advertising in violation of 15 U.S.C. § 1125(a); however, a permanent injunction may only issue where there is a likelihood of irreparable injury in the absence of the injunction.  E.g., Century 21 Real Estate LLC v. Paramount Home Sales, Inc., No. 06-CV-2861, 2007 WL 2403397, at *7 (E.D.N.Y. Aug. 20, 2007).  "In general, the likelihood of injury and causation [from a false advertisement] will not be presumed, but must be demonstrated in some manner."  Time Warner Cable, 497 F.3d at 161 (internal punctuation omitted).  However, such a presumption of injury is proper "when the defendant has explicitly compared its product to the plaintiff's or the plaintiff is an obvious competitor with respect to the misrepresented product."  Hutchinson v. Pfeil, 211 F.3d 515, 522 (10th Cir. 2000), cited approvingly by Time Warner Cable, 497 F.3d at 162.  SimplexGrinnell and ISPI are obvious competitors in the market for service of Simplex fire alarm systems, and ISPI repeatedly coupled its advertisements implying that it could perform programming with the

_certified_ (Ex. 44), is not actionable. Moreover, this statement was not made broadly enough to constitute a Lanham Act violation, and it was not made in New York, as is necessary to violate the relevant New York statute.

[21]  The Court is mindful of the admonition that "[i]n considering the issue of falsity, the court should consider the advertisement in its entirety and not engage in disputatious dissection" of the message.  Time Warner Cable, 497 F.3d at 157, quoting Avis Rent A Car, 782 F.2d at 385. But that does not mean that individual components of a statement cannot be respectively true and false, as is the case here.  Rather, the quoted language is simply a directive to assess the truth or falsity of a statement in light the message it conveys in its full context.

54

statements that it offered better value and cost savings.  (<u>E.g.</u>, Exs. 48-56, 58-59, 62-66, 68-71, 74-77, 124-71, 173-79, 181-94.)  Irreparable injury from ISPI's misleading statements about its ability to program such systems is thus appropriately presumed.

62.   Accordingly, an injunction will issue against ISPI's advertising or otherwise representing to any potential customer outside of those on the ISPI Customer List, that it is legally able or entitled to perform programming work using copyrighted software and/or proprietary dongles.  This portion of the injunction will work in tandem with the injunctions against copyright infringement and misappropriation of trade secrets to enjoin ISPI from advertising that it is able to do what it legally cannot do.  However, ISPI will not be required to issue corrective statements to supplant its previous misrepresentations.  This additional component is unnecessary in light of the fact that ISPI will be contemporaneously enjoined from performing any unauthorized programming work for new customers.

## IV.   Breach of Contract Claims

63.   Both parties allege breach of the Bankruptcy Stipulation by the other – ISPI for SimplexGrinnell's refusal to sell it service parts for its existing customer base, and SimplexGrinnell for ISPI's continued use of the SimplexGrinnell website.  A breach of contract claim under New York law requires (1) the existence of a valid contract; (2) performance by the party alleging breach; (3) non-performance by the other party; and (4) damages attributable to the breach.  <u>Wharton v. Duke Realty, LLP</u>, 467 F. Supp. 2d 381, 393 (S.D.N.Y. 2006).  Though both parties are guilty non-performance to some degree, neither breach of contract claim is sustainable.

64.   As established above, paragraph nine of the Bankruptcy Stipulation requires SimplexGrinnell to sell ISPI all the "service parts" it requests to service the customer base existing as of the time of the Stipulation.  SimplexGrinnell has not done so.  In light of the

findings the 4100U Programmer, dongle and test tools are all "service parts," and that SimplexGrinnell has refused to sell these parts to ISPI for service of customers on the ISPI Customer List, there is no question that SimplexGrinnell has failed to perform its contractual duties.  However, ISPI's breach of contract claim necessarily fails because of its complete failure to establish any damages attributable to SimplexGrinnell's conduct, which is an essential element of the claim.

65.  Moreover, ISPI has not entirely lived up to its end of the Bankruptcy Stipulation bargain.  Paragraph ten strips ISPI of access to technical support from SimplexGrinnell in the form of "'online access' or access to any other proprietary information or networks of SimplexGrinnell." (Ex. D ¶ 10.)  Andrew Guarino readily admits that, following the execution of the Bankruptcy Stipulation, he and others at ISPI continued to access SimplexGrinnell's website, using a password previously provided, to download revisions to the 4100U Programmer. Although ISPI recognizes that it did this despite the fact that "SimplexGrinnell had a right to deny website access under the Bankruptcy Stipulation," it attempts to justify its actions in light of SimplexGrinnell's "violat[ion of] the agreement [through] it[s] fail[ure] to provide ISPI with any alternative means of obtaining 4100U configuration programming software upgrades and revisions." (D. Proposed Findings ¶ 34.)  Although ISPI was not necessarily entitled to this "self help" remedy – and in any event, ISPI unequivocally helped itself to too much, as ISPI admitted to using a Programmer downloaded from the website not only to service existing customers, but also in servicing new customers – SimplexGrinnell's own substantial failure of performance through its failure to sell ISPI service parts for servicing the existing customer base defeats its

breach of contract claim against ISPI.[22]

## V.    Costs and Fees

66. Both parties contend that they are the "prevailing party" entitled to attorneys' fees and costs pursuant to paragraph eighteen of the Bankruptcy Stipulation. They are both wrong. Neither can properly be said to be "prevailing" and fee-shifting is not equitable under the circumstances. See note 16 above.

## CONCLUSION

For the foregoing reasons, SimplexGrinnell's request for a permanent injunction is granted in part and ISPI is permanently enjoined from infringing upon versions 8.04, 9.02, 10.01, 11.01 of SimplexGrinnell's 4100 and 4100U ing software in servicing customers not on the ISPI Customer List, using a SimplexGrinnell software key or dongle for servicing customers not on the ISPI Customer List, and advertising that it is able to program SimplexGrinnell 4100 or 4100U systems at any sites not on the ISPI Customer List. SimplexGrinnell's other claims for relief are dismissed, as are both parties' breach of contract claims. SimplexGrinnell's motions to exclude evidence of damages (Doc. #64) and to strike Guarino's affidavit (Doc. #65) are denied, and its motion for leave to file additional trial affidavits (Doc. #66) is granted.

SO ORDERED.

Dated: New York, New York
       March 31, 2009

GERARD E. LYNCH
United States District Judge

---

[22] ISPI also argues that SimplexGrinnell's breach of contract claim is preempted by the Copyright Act. (D. Mem. 29.) Because the claim would fail in any event, this issue need not be addressed.

57